We'll move to argument next in No. 21-2117, CKD Project v. Fresenius Medical Care Holdings. Thank you. Mr. Miller is on Zoom, so we're going to open up the Zoom. Okay, Mr. Miller, whenever you are ready. Just getting my gear on here, Your Honor. Thank you. May it please the Court, my name is Dan Miller. I represent CKD Project, the appellant in this matter. The District Court's decision below is based on two paragraphs from a 240-page FCC filing. And for the Court's reference, since this appeal is based entirely on those two paragraphs, the language is quoted in full in our opening brief on pages 14 and 15. As the Court can see at a high level, these two paragraphs articulate in rather sanitized legalese the routine run-of-the-mill and ever-present risks that every health care company in the United States faces on a daily basis. Given that the appeal rests on these paragraphs, I submit that a more granular look at the language is worth the panel's time and consideration. I'll begin with the title sentence, which says, I quote, If our joint ventures violate the law, our business could be adversely affected. Forgive me for stating the obvious, but this sentence states what is true 24-7, 365 for every health care company in America. And that is, if you enter into legal business It seems like the filings include more than just saying that if it violates the law, there's going to be a risk. Because obviously that's true. But it says specifically that they operate the centers as joint ventures. It says that it might be found – they've tried to obtain the safe harbor under the kickback statute, but they do not qualify for the safe harbor. And so if somebody found it to be a safe harbor, then that would be the specific violation of the law. The filings explain how they had to go through all of the different entities in order to acquire the dialysis centers. It explains the New York state regulations that required that kind of a structure. The filings explain the non-compete agreements with physicians. And they also show that most of their assets are goodwill. It explains that they pay a lot for goodwill, and then there's a statement of costs that shows a lot more money in goodwill than in property, plants, and equipment. So isn't that all the information that one needs to make the argument you're making? And what you're providing is an inference of fraud. You're saying, well, all of that money that went to goodwill must have been a kickback. But that's not a new fact, right? That's an inference you're drawing. Your Honor, respectfully, I would disagree with that. I was going to go through each of the things that you just went through in terms of covering the filing, but Your Honor, I was just going through them, so I won't bore the court by doing it again. But the points that you made are all plain, vanilla statements. In other words, the fact that Fresenius enters into these joint venture arrangements is perfectly— What is the requirement of disclosure? In other words, as I understand it, the law doesn't require that the fact of the fraud be disclosed or it doesn't require every detail. It's enough that the disclosure sets the government upon the trail of the alleged fraud. Would you agree that that's the standard? Absolutely not, Your Honor. Our briefing repudiates the trail of fraud standard and explains why that standard is actually not the law. The Second Circuit is very clear, and I think that's one of the few things that the parties in this case actually agree on, which is that in order for a document to be a public disclosure that bars an otherwise meritorious suit, every element of the alleged fraud has to be included in the public disclosure. I would agree with Your Honor that you don't have to say that this is fraud, but every element of the alleged fraud has to be included in the public disclosure. But if you're deciding whether the element was included, one question that courts ask is whether there was enough information to set somebody on the trail of the fraud. Since the fraud doesn't need to be disclosed, what needs to be disclosed is the facts that reveal the fraud. Then whether the facts disclosed were sufficient to lead to the inference of fraud, that's a relevant consideration in determining whether the material elements were disclosed, right? I again would disagree with Your Honor on that articulation of the standard. It's more strict than that. This is not a smell test where a public disclosure can be found when there are – if you add up a bunch of inferences that are contained in disparate sections of a large file. Can I just put it this way? So then what are the facts that were not revealed in the disclosure that your client revealed? Well, Judge, we'll start with the most important fact, which is the kickback. This case is a kickback scheme. And nowhere – well, I'll articulate it this way. The kickback was in the form of vastly inflated purchase prices, and the purpose of the vast overpayments was for patient referrals. And when you say – Nowhere – Can I – I want to even just break down that piece, because I see loud and clear the allegation that this was vastly overpaid. I think as I read the complaint to understand what that's based on, because overpayment's kind of a conclusion, right? It's less of a fact than a conclusion. The fact that you rely on in concluding that it's overpaid is that the contract price is greatly in excess of the tangible assets of the practice being acquired. So one question – and from which you infer that that means that the paying for goodwill is tantamount to kickbacks for buying patients. One question that I'd like to ask – I have two questions. And one is – and I realize this goes to the merits, but it overlaps a little bit. Is it – can you point me to any law that says that in acquiring a medical practice, paying for goodwill, which includes the existing patient relationships that are presumed to come along with that acquisition, violates the anti-kickback statute? Because I couldn't find any cases or anything that – there's your 2005 guidance that you gave us. But is there anything since then or more binding? Your Honor, to our knowledge, there's no case that rules on that issue either way. In other words, we're aware of no case that finds that payment for patient relationships is per se a violation of the kickback statute, but nor are we aware of any cases which say that it is not a violation. And the law is very clear, though, even though there's not a case on this, that you cannot pay for patient referrals. And this is the exact reason we believe this case merits getting into discovery, which is where we would get further into exactly what was paid for. And the evidence in the case shows that the vast majority of the money here – it's one thing to mention, and I'll just point out to the panel. It's one thing to mention goodwill in this filing, but there's no statement in this filing that goodwill is somehow a material or even the primary value of the purchase price. Well, I don't know. The filing said the growth of our business through acquisitions has created a significant amount of intangible assets, including goodwill. A portion of the purchase price was allocated to intangible assets. And if you look at the consolidated balance sheets, there's a lot more value in goodwill than there is in the tangible assets. So it does seem like it is revealing that they pay a lot for goodwill and hold a lot of value in goodwill. Now, I understand that they did not say that the goodwill payment – the payments for goodwill were an overpayment or were a kickback. But isn't that the inference of fraud? So you're drawing the inference of fraud, but you're not revealing a transaction that was not revealed in these documents. Judge, I would say that that brings us to where we are procedurally, which is at the motion-to-dismiss stage. All inferences, all fair and reasonable inferences need to be drawn in favor of the plaintiff as opposed to the defendant. That – looking at it in the manner that Your Honor just was explaining would be looking at this in the fact – in the manner favorable to proscenius, which is, hey, look. We disclosed goodwill in our filing, and you can infer if you look at it the way that we look at it that this goodwill was for referrals. But the statements don't go anywhere close to that. They mention goodwill, and they mention that they are part of the transaction. But I think you just restated what I was saying, which is if all – if what you're doing is drawing the inference that the payment for goodwill was fraudulent, then you're not adding new facts. You're adding the inference of fraud, and that's not enough to overcome the public disclosure bar, right? No, I disagree with that. I'm sorry I disagree with the battle so much. That brings us to the – it would bring us pretty quickly to the original source part of the analysis, which is whether the plaintiff adds information that is material to understanding what happened here. In this case, the contracts that we have are the only – that we provided, confidential, nonpublic contracts that we provided that proscenius gave to our client in the context of one of these illegal joint ventures. So direct admissions from the company in its own words where it comes out and says that it is paying for patient lists. It is paying for appointment books. It is paying for the warranties, airtight – effectively airtight warranties from the individual physicians that they have to warrant in these contracts that they – their existing patient relationships are expected to continue undisturbed such that proscenius knows once it pays over this overstated purchase price, it's going to get the patient relationships. And then it seals the deal with the noncompetes, but that – we don't place a great deal of effort – emphasis on that. The key part of this scheme is a payment for referrals, and the only evidence that's in this case that shows a payment for referrals are in the contracts because that's where it's explained what exactly proscenius is getting. What's in the SEC filings are vague references to Goodwill, and I would analogize it this way, Your Honor. It's like – let's think of a brand name, like someone is going to sell a McDonald's – I'm going off the top of my head here, but someone is going to sell a McDonald's franchise to another franchisee owner. The brand is what is being sold. The Goodwill is the Goodwill of the customers at large to the McDonald's brand. Here we're talking about individual dialysis centers. We're not talking about some brand. We're talking about individual patients of doctors who are otherwise unknown to the public and what the contracts show is – So you're saying it's not really Goodwill. You're saying that individual dialysis centers can't have Goodwill or that kind of brand loyalty? They can. You're saying the facts that you uncovered reveal that they're not just paying for Goodwill. They're actually paying for the referrals. That's exactly right. Okay. I think we have that. There's nothing in these contracts that says you need to maintain the standing of your dialysis center in the community and operate it. I think we have that argument. You've reserved time for rebuttal, so we'll hear from you again, but let's turn to the appellee, Mr. Bennett. Thank you very much, Your Honors, and may it please the court. In this case, we think the judgment should be affirmed because the public disclosure bar turns on the disclosure of transactions, and here our disclosures do do that. On the inference point where the question was going, the court's question came straight out of Kirk, of course, as I think that you're aware, which is that you don't have to say that it's a fraud or that it's the legal element of overpaid. You just have to have something that creates an inference of impropriety. That's not a pleading standard issue under 12b-6 or Rule 9. It's a standard that talks about what the purpose of the public disclosure bar is, and here this is, as the judges below both noted, this is not a plain, it is not a vanilla, it is not a nonspecific, it's not a statement that, oh, we have joint ventures. We go through all the critical elements that the court already identified, and this is an unusual case for public disclosure bar. Disclosure does not actually reveal that there's an overpayment for the facilities, right? Well, I think that what it does is what's required, which was give somebody or the government an inference because we say that there's an AKS issue. So what is AKS? As we say in our public disclosures, the anti-kickback statute prohibits remuneration in exchange for a referral, and that's also in our public disclosure. I guess if I read that paragraph just without the background of this case, I would think that the concern would be that because the doctors had a minority interest in the centers, that then their referrals to the centers would be kickbacks because they profit from the centers doing well. I wouldn't necessarily make the inference that there was an upfront payment for the purchase of the centers. Well, I think there's two issues there. First off, those are the false claims that are at issue, right? This case is a false claims act case. The claims that they're suing over are the claims for the referrals to the clinics for the purpose of treating them in a place of minority. You might identify the claims, but the element of the kickback is not the payment they get from having an interest in the center. It's an upfront, or at least under the allegations, it's the upfront purchase price of their interest in the centers, right? I think there we would say that we disclose the transaction, which is what's important. The transaction is the entry of the joint venture, which we disclose. Why isn't the, assuming it's a fact, the fact of the inflated payment an essential element of the scheme? Why is that? Why is that not an essential element? That was not disclosed, right? The essential element- If we assume that the payments were inflated, that fact was not disclosed. Well, I think then we go back to the point that was made initially, which is why are they inflated? And the only thing that's alleged in the case is they're inflated because we're not just paying for the chairs and the assets. You're assuming they're not inflated, in other words. But if that argument assumes that they are not inflated, that you're paying for things like goodwill. If they are inflated, I mean, would you agree that there's no concession that payments were inflated? Well, I don't think that we concede, as we don't have to for the public disclosure bar, that they were overpaid. But I think we do clearly disclose that we are doing these for things in excess of the tangible value, which is their theory. The theory isn't that- for intangible assets, including goodwill. And the relator is drawing the inference that that is a kickback. You don't accept that inference, but you've disclosed all the underlying facts. Right, and I would only add to that, that's how they allege it. They don't allege that we just came up with some money and we slipped it under the table. The way that they allege it is exactly what the court observed, which was the reason it's overpaid is we pay beyond tangible assets. And they say that three or four different times. I'm trying to figure out why. What is relator added to the conversation? One of the things they add is that these contracts included, or at least the contract in the transaction that they detail in detail, is a warranty as both to the number of patients and the maintenance of relationships. I take their argument to be that warranty is a new piece of information that tells us it's not just goodwill they're paying for, it is literally these patients, they're buying patients, that's the heart of the anti-kickback statute claim. And that's why we've added value, whether it's in the context of being an original source or not being barred. What's the answer to that? The answer to that is that this falls directly right within the doctrines that say adding specific examples or details when the overall scheme has been disclosed is insufficient. Because here they plead very specifically, paragraph 39 of their complaint, that our public disclosure describes the scheme that they're suing about. It's an unusual case because the relator, I think hoping the government would intervene, and then they didn't. But hoping the government would intervene, they specifically describe the overall scheme, which is purchase of referrals, part of a large series of transactions, and they support that in paragraph 39 of their complaint by then quoting our annual report disclosure. So all of the, I think anybody reading our disclosures knows that there's a complex set of documents that are entered as part of this. All they have done is add details to a scheme that they have described that's broader, and they describe it in paragraph 2 of their complaint as we enter into these joint ventures for the purpose of inducing referrals. And then we say if our joint ventures are found to violate the Anti-Kickback Act, those are based on prohibited referrals. So what they've done is apparently getting access to contract documents. There's always more details that can be added, which is what the magistrate judge noted. But the fundamental point of the disclosure and the overall prospect is we have joint ventures, and they could be viewed as paying for referrals. And if they are, there's this violation that puts you on the trail of the fraud. You know, it's interesting that you mentioned the magistrate's ruling because the magistrate said the existence of this arrangement just transforms these transactions from legal ones into violations of the Anti-Kickback Statute. And then it all repeats. All it does is transform a benign transaction into an unlawful one. If that's the case, isn't that exactly what it means to add additional material content to what's already been disclosed? I think what the magistrate judge was saying there, and it's certainly how the district court judge, I think, understood it, is that's the difference between having to plead legal elements versus facts of the transactions. And I think what the magistrate judge is saying there is simply, okay, well, they've disclosed remuneration. They've disclosed the risk of the kickback. They've disclosed that under the AKS, the issue is whether you're paying for referrals. And then by calling something a payment versus an overpayment, that puts us into that doctrine where all they're doing is adding labels and legal conclusions as opposed to a fundamental element of the transaction. Right. And I'm not moved by the overpayment piece. What I'm focused on right now is the warranty as to the number of patients. Because it strikes me that there's disclosure as to the huge significance of goodwill as an element of the acquisition price, as the element of the assets that percentage carries. But goodwill is this big umbrella term that encompasses your reputation in the community or relationships with other people. There's all sorts of things in there that make it hard to say goodwill equals we're paying for patients. The warranties and reps make it pretty clear that you're paying for patients. Isn't that new? If we got into this, the contracts, we very clearly have provisions saying we're not paying for payments. But on the balance sheet and the disclosure of goodwill, goodwill is essentially everything in excess of those hard assets. So whatever all that is, it's clear that when you look at goodwill, you're looking at the business as a going concern. And we say that it's based on future cash flows. So all of that is completely baked into that, those financial disclosures that we make, because goodwill is all of the things that are in excess of the chair. So it is definitely encompassed in that. And when you say those disclosures, you're talking about the consolidated balance sheets that are in your SEC filings that show a lot more assets in goodwill than in property and intangible assets. Is that what you're talking about? Yeah, Joint Appendix 213 is the financial statement. And then we also have a disclosure that we're carrying a significant amount of goodwill. So Joint Appendix 213 shows us that we have $11.6 billion in goodwill and $757 million in intangible assets and $3 billion in property, plan and equipment, as the court pointed out at the beginning. But we also talk about how we estimate our values using cash flows. And the growth of our business through acquisition has created a significant amount of intangible assets, including goodwill. That's a separate disclosure on Joint Appendix 212. So those are the places where all of this is detailed. I think Judge Pulsara, Judge Kogan got it right, which is we've disclosed we have these arrangements. We've disclosed we buy in and we pay for goodwill. We disclosed that somebody could infer that we're paying for referrals because we talk about prohibitive referrals in our disclosures. We define the Anti-Kickback Act on page 394 of the appendix as paying remuneration for referrals. This is the furthest thing from a vanilla disclosure that, you know, the company could come up with. And I think that it definitely meets the public disclosure requirements under Kirk and Monahan in this court's cases. Okay. Thank you very much, Mr. Bennett. Let's turn it back to Mr. Miller. Thank you, Your Honor. What jumps out at me from counsel's argument just now is that there's a very big distinction that can be drawn even in this courtroom between the goodwill that Fresenius, as the largest dialysis provider in the United States, puts on its balance sheet and the goodwill that arises from the confidential nonpublic contracts through which Fresenius locked in a years-long series of patient referrals by requiring the selling physicians to turn over their patient lists, their patient appointment records, to make promises and warranties about delivering these people as active, good dialyzers to Fresenius and effectively ensuring a years-long referral stream. There is not a single comment in any one of the things that counsel just referred to that would allow anyone, even a trained law enforcement officer, to figure out what was really going on here unless they saw the contracts. And that's what the court below found. I disagree with Mr. Bennett. The court below found that the joint ventures in and of themselves were benign, and it was the inflated payments and the conditions attached to those inflated payments. What's in the contract? What is in the contracts that's not in the disclosures? I mean the contracts don't say these are inflated prices, right? So what's there? Well, the contracts contain the provisions that I'm referring to, Judge Kinn, and specifically in order to get paid, the doctors had to put together patient lists, every patient that they actually had. They had to turn over their appointment books going back for years. They had to make express written warranties regarding whether they had- I mean wouldn't one expect that if you were buying a business you would get the patient list? It seems to me that's part- Judge, I don't know what anyone expects. That's part and parcel. I don't think the court can infer. If you are buying a medical business or one doctor buys another doctor's practice, or even in a situation like this you are buying an ongoing medical business, one would expect to get patient lists. Judge, I'm not sure that's true. I think it's probably more fair to say that – I mean I'm not a financial analyst, but isn't it more fair to infer that what you really are looking for is the overall profitability of the business in terms of its balance sheet? I mean here we're not talking about, hey, how much money did this dialysis center bring in? What were its expenses? We're talking about, hey, what are the names of the people? As a matter of common sense, if one is buying an ongoing dialysis business, you would expect to get the patient list. Your Honor, I don't think that that's a fair- You don't agree with that? I don't think that that's a- Okay. I do not. All right. Well, thank you. I do not. Unless there are further questions. Thank you, Mr. Miller. The case is submitted. And because that is the last argued case in our calendar for today, we are adjourned. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor. Thank you, Your Honor.